IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| V. | ) CRIM. NO. 07-200 (EGS) |
| | ) |
| DARYL GASKINS, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Mr. Gaskins, through undersigned counsel, respectfully submits this memorandum in aid of sentencing for his sentencing hearing which is currently scheduled for February 28, 2008. Mr. Gaskins requests that the Court sentence him to a sentence at or near the 60 month mandatory minimum.

Mr. Gaskins is 48 years old and suffers from hypertension, asthma, hepatitis C, and Type II diabetes. He is also HIV positive. He takes more than 10 different medications to control his medical conditions. He also suffers from attention deficit disorder. He has a long standing drug and alcohol dependency. The Presentence Report incorrectly asserts that Mr. Gaskins denies drug usage. He has consistently admitted to counsel his drug problem, has tested positive while on supervision, and clearly needs drug treatment. Despite all of this, he was employed at the time of his arrest in this case, caring for his quadriplegic brother-in-law.

Mr. Gaskins received only a minimal education. He was committed to Cedar Knoll at the age of 13. Although initially committed for 30 days for simple assault, his commitment was extended and he does not recall ever being told why. He recalls being held for two years with no

1

explanation provided to him. Although he does not demonstrate great insight into his feelings and emotions, when he discusses his early years, he clearly exhibits feelings of abandonment at that early age.

When asked about his earliest childhood memories, Mr. Gaskins has few pleasant memories to share. He recalls going to the movies with his mother and walking through the same cemetery he now looks out at from the jail. His biggest dream now is that he be released from jail soon enough to allow him to walk through that cemetery again, rather than be buried there having died behind bars. He fears the poor diet and medical attention he receives while incarcerated will exacerbate his medical conditions and will lead to an early death.

Mr. Gaskins was raised in an environment where he had to fight to survive. He recalls everything going downhill rapidly when his mother got married when he was 8 or 9 years old. He and his stepfather never got along and he was abusive. His stepfather worked and provided support both financially and emotionally to his own daughter, but not to Mr. Gaskins, leaving him with very low self-esteem. His mother was not able to protect him from his stepfather's abuse which continued until he was locked up at the age of 13. In addition to the abuse he suffered at his stepfather's hands, he lived in a violent neighborhood where he had to fight to survive. His commitment to Cedar Knoll stemmed from fighting at school – a behavior he learned from his environment. The fact that his commitment was extended with no explanation given to him is the source of a continued distrust of the system and fatalistic attitude. The environment at Cedar Knolls was no different than that he experienced in his own neighborhood – one in which he had to fight to survive. He does not recall receiving any counseling to deal with the emotional issues he was facing, nor did he receive any real education.

He was diagnosed as HIV positive in 1992, after learning that the woman he was involved with was HIV positive. He recalls being very angry because he learned that she knew she was HIV positive – her daughter had died from AIDS – and yet she never told him. Although he was working, she stole everything he had to support her drug addiction. Mr. Gaskins began selling drugs to support his own drug addiction which was too great to support on his legitimate income despite his employment.

The Probation Office has determined that Mr. Gaskins is a "career offender" as defined by the United States Sentencing Guidelines. However, the Court is not bound by that determination, nor is it bound to sentence him in accordance with the resulting guidelines range. In fact, among the guidelines' various sentencing provisions, the "career offender" provision deserves the least deference from this Court as a measure of reasonableness. The principal reason the government and some courts have given for continuing to give the Guidelines as a whole "great weight," i.e., that the Sentencing Commission has "carefully calibrated the extent to which offender characteristics determine a sentence," United States v. Wilson, 355 F. Supp. 2d 1269, 1275 (D. Utah 2005), simply does not apply to the career offender provision. Section 4B1.1 has nothing to do with the "institutional advantages of the Sentencing Commission," id. at 1281, and is not a product of the Commission's expertise or study. Cf. Booker, 125 S. Ct. 738, 767 (2005) (Breyer, J.) ("[t]he Sentencing Commission remains in place writing guidelines, collecting information about actual district court sentencing decisions, undertaking research, and revising the Guidelines accordingly"). To the contrary, Congress foisted the career offender provision onto the Sentencing Commission through the passage of 28 U.S.C. § 994(h). That statute states that the Sentencing Commission:

> shall assure that the Guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old and has been convicted of a felony that is a crime of violence or a controlled substance offense and has previously been convicted of two or more prior felonies, each of which is either a crime of violence of a controlled substance offense.

Id.  See also United States v. Phelps, 366 F.Supp. 580, 590 (D. Neb.) (noting the "statutory directive" of 28 U.S.C. § 994(h)).  Thus, § 4B1.1 is not a product of the wisdom, study or expertise of the Sentencing Commission.  Rather, it simply tracks a statute passed by Congress that contained a highly specific directive for the Commission to enact.  See also U.S.S.G. § 4B1.1, Background Note (stating that the career offender provision is a response to a Congressional "mandate," and that 4B1.1 simply "implements the Congressional directive, with the definition of a career offender tracking in large part the criteria set forth in 28 U.S.C. 994(h)").  The career offender provision is a prime example of "the Commission not function[ing] as a sentencing expert in the way [its originating] statute envisioned."  United States v. Jaber, 362 F.Supp.2d 365, 374 (D. Mass. 2005).

The definition of a "career offender" foisted on the Commission "subjects some defendants to not just substantial, but extraordinary increases in their advisory Guidelines ranges."  Phelps, 366 F.Supp. at 590.  The court in Phelps found:  "In some of these cases, the Court believes a non-Guideline sentence may be sufficient, but not greater than necessary, to both comply with Congress' desire to punish recidivism and the purposes set out in § 3553(a)(2)."  Id.; see also United States v. Carvajal, 2005 WL 476125 (S.D.N.Y.) (declining to impose career offender sentence of 262-327 months for conspiracy to distribute crack cocaine and instead imposing non-guideline sentence of 168 months).

The Sentencing Commission itself has recognized the excessive nature of the career offender provision. In its recent publication <u>Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform</u> (November 2004), the Commission touts the Guidelines' success in reducing unwarranted disparity in general, but notes that the disparity that remains is attributable to four remaining problems: mandatory minimums, the crack/powder disparity, the **career offender provision**, and the disparate policies among U.S. Attorneys Offices. In this case, the career offender provision results in a sentence for Mr. Gaskins that is disparate to similarly situated defendants and runs contrary to the very goals of sentencing reform.

The Commission specifically identifies the career offender provision as a sentencing rule that disproportionately impacts a "particular offender group" but serves "no clear sentencing purpose." <u>15 Year Assessment</u> at 131-33. The "particular offender group" disparately impacted by the career offender provision is African-American offenders, such as Mr. Gaskins. African-American offenders constituted 26% of offenders sentenced under the guidelines in 2000, but were 58% of offenders sentenced under the career offender provision, due mostly to the "inclusion of drug trafficking crimes in the criteria qualifying offenders for the guideline." <u>Id.</u> at 131-33.

> The Commission states:
>
> [P]reliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders who are assigned to criminal history Category VI.

<u>Id.</u> at 134. This suggests that the career offender guideline range is not necessary to protect the

public from future crimes of the defendant when the provision's application rests on a prior drug trafficking conviction.

Under Booker's non-mandatory scheme, this Court is free to recognize that the guidelines' one-size-fits-all approach to "career offenders" – treating everyone with a certain statutory maximum identically, regardless of the number or nature of the qualifying predicates – in fact undermines the goal of uniformity set forth in § 3553(a)(6).  See United States v. Carvajal, 2005 WL 476125 (S.D.N.Y. 2005) (career offender guidelines satisfy certain goals of sentencing not met by non-career guidelines but can be excessive in light of the nature of the defendant's recidivism :for the Guidelines for Career Offenders are the same regardless of the severity of the crimes, the dangers posed to victims' and bystanders' lives, and other appropriate criteria;" sentencing at 168 months where non-career range was 63-78 and advisory career offender range was 210-262 months).

In the absence of a career offender designation, assuming the criminal history points are as assessed by the Probation Office, Mr. Gaskins would have been at an offense level 25, criminal history category IV.  His resulting guideline range would have been 84 to 105 months. That range reflects the amount of drugs he possessed with intent to distribute, each of his prior convictions, and his status of being on supervision at the time the offense occurred.  Because he was on supervision at the time of the offense for a conviction that occurred more than 25 years ago, he also faces certain parole revocation.  He was also on probation for a relatively minor drug offense.  It is those two offenses – one which occurred more than 25 years ago and the more recent low level drug offense that led to his being categorized as a career offender.  In addition to facing parole revocation, Mr. Gaskins faces additional time for the violation of his probation.

All three of these sentencings are based solely on the criminal conduct in this case. He was otherwise in compliance with his supervision, working and reporting as directed.

Even the guidelines recognize that career offender treatment is inappropriate where that status "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." § 4A1.3. To depart under that provision, the Court need only find that the defendant's risk of recidivism is over-represented, not that it is zero. See United States v. Clark, 8 F.3d 839, 843 (D.C. Cir. 1993) (rejecting government's argument that a departure under this provision "is only appropriate when any type or degree of recidivism is unlikely" and holding that "a finding that recidivism is unlikely is not a prerequisite to a departure under § 4A1.3").

Pursuant to Booker, the Court now has the discretion to sentence Mr. Gaskins in light of all the factors set forth in § 3553(a) and to seek a uniformity in sentencing that takes into account the real similarities or differences between defendants. The mandatory guidelines provided uniformity only in the sense that they treated alike people who were **defined** alike under the guidelines – a circular kind of uniformity – even if, considering other factors, they were not alike. For example, under the guidelines, everyone whose record triggers the "career offender" designation is treated alike even if they and their offenses are very different. This illusion of uniformity is nothing than that and is entitled to no deference whatsoever.

Mr. Gaskins is not asking to be sentenced to anything less than anyone else who possessed with intent to distribute the amount of heroin he was charged with and who had a criminal history category IV. What he is asking is that the Court not sentence him to a sentence of more than twice that amount. We contend that to do so would be to sentence him to a

sentence that is much "greater than necessary" to meet the statutory purposes of sentencing. We ask that the Court sentence Mr. Gaskins to a sentence much closer to the mandatory minimum of 60 months.

        Respectfully submitted,

        A.J. KRAMER
        FEDERAL PUBLIC DEFENDER


        _____/s/_____
        MICHELLE PETERSON
        Assistant Federal Public Defender
        625 Indiana Avenue, N.W., Suite 550
        Washington, DC  20004
        (202) 208-7500